## Wytheville.

ALLISON v. ALLISON'S EXECUTORS AND OTHERS.

June 11, 1903.

1. WILLS—*Case in Judgment—Construction—Contingent Remainders—
Heirs at Law—At What Time to be Ascertained—Pretermitted Chil-
dren.*—A widower, having one grown daughter, made his will. Sub-
sequently he married and settled on his wife $50,000 in lieu of
dower and distributive share in his estate. After he married, he
added a codicil, and subsequently a son was born. The testator
then died leaving a large estate, real and personal, and surviving
him his widow, the daughter and son aforesaid, a brother, a sister,
and the descendants of two deceased sisters. The will and codicil
aforesaid, so far as the same need be recited, are as follows: "All
the residue of my estate, real, personal, and mixed, I give to my
executors in trust for the sole and separate use of my daughter. . . .
to have and to hold for her benefit during her natural life . . . and
at her death to be equally divided among her children, should any
survive her—if she should die without issue, or if her surviving
child or children should die before becoming of age, then the pro-
perty bequeathed for the benefit of my daughter is to be divided
among my heirs at law according to the laws of the State of Vir-
ginia." Codicil: "To provide against my sudden death, causing
injustice to my dear wife, Minnie Clemens Allison, I hereby direct
my executor or executors to invest one hundred thousand dollars
. . . to be held by my said executor and my brother-in-law,
Clemens Jones, as joint trustees, for her sole and separate use and
benefit, during her natural life, and at her death to go to her child
or children, if there should be any by me, and if there should be
no child or children by me, then to go to my legal heirs. . . .
As to the remainder of my estate, I wish it to be distributed as
directed" by my will. . . . "In confirming the directions given
in letter (will) herein referred to, I desire only such changes to be
made as will equitably and practically carry out its intentions in

case of the death of any beneficiary therein named making a change necessary, and I wish the legal heirs of any such beneficiary to receive such beneficiaries' share."

*Held:*

1. The gift of the entire residuum of the estate to the children of the daughter surviving her creates in them contingent remainders, for until the death of the daughter it cannot be told which of her children will survive her and attain the age of twenty-one years.

2. The gift over to testator's "heirs at law according to the laws of Virginia," was a gift to the persons answering that description at the death of testator, and not at the death of life tenant.

3. The ultimate remainder given to said heirs is contingent and not vested; being limited over after a preceding estate which is contingent.

4. As the residuary clause of the will blends real and personal estate, and gives it to the heirs at law of the testator, the persons answering that description take the whole, and the widow takes no part thereof; there being nothing to indicate a contrary intention on the part of the testator.

5. The son takes a vested remainder in the legacy of one hundred thousand dollars given to his mother.

6. The son, having the vested remainder aforesaid, is not pretermitted within the meaning of section 2528 of the Code. Any provision for a child which shows that he has not been forgotten is sufficient to prevent the application of the statute.

2. WILLS—*Construction—Intent of Testator—Common Words—Technical Words.*—The object in construing wills is to arrive at the true intent of the testator as gathered from the language used. Not the presumed or supposed intention but the correct meaning of the words actually used. Words should generally be given their ordinary and usual signification, but technical words are presumed to have been used technically, and words of a definite, legal signification are understood to be used in their definite legal sense unless the contrary appears on the face of the instrument.

3. WILLS—*Words of Survivorship—Doubtful Meaning—Vested Remainders.*—Words of survivorship used in a will are to be construed as referring to the testator's death rather than to that of a life tenant, unless a special intent to the contrary appears on the face of the will; and if, upon a fair construction of the whole will there is doubt as to the character of the remainder, it will be held to be vested rather than contingent, in order that the estate or interest may vest at the earliest moment consistent with the terms of the instrument construed.

Appeal from two decrees of the Chancery Court of the city of Richmond, pronounced February 8, 1900, and December 11, 1900, respectively, in a suit in chancery, wherein the executors of James W. Allison were the complainants, and the appellant and others were the defendants.

*Amended and Affirmed.*

The opinion states the case.

*Christian & Christian,* for the appellants.

*Leake & Carter, Meredith & Cocke, J. Preston Carson,* and *Samuel A. Anderson,* for the appellees.

KEITH, P., delivered the opinion of the court.

The bill in this case asks the court to construe the will of James W. Allison made on October 2, 1885, and the codicil thereto dated November 29, 1892, which will and codicil are as follows:

"In case I should not return, this is my will with regard to my property: I give to Warner Moore the property on the dock between the creek and Seventeenth streets, running from the dock to the river, to have and to hold—reserving, however, an annual ground rent free of all taxes and insurance or assessments of six hundred dollars per annum, which he is to pay to my sister, Jane E. Moore, during her life, and after her death to her daughters, Annie W. and Mary Elizabeth, to be divided equally between them so long as they both may live, and at the death of either, the whole amount to be paid to the survivor— at the death of the last one, the ground rent is to expire and cease and Warner Moore or his heirs is to have a fee simple title to the property.

"I give to my sister, Victoria Ellen Carson, ten thousand dollars in cash, to be paid by my executors at any time within two years after they qualify.

"All the residue of my estate, real, personal, and mixed, I give to my executors in trust for the sole and separate use of my daughter, Dora, wife of Thomas L. Moore, to have and to hold for her benefit during her natural life, free from the control of her said husband, and at her death to be equally divided among her children, should any survive her—if she should die without issue, or if her surviving child or children should die before becoming of age, then the property bequeathed for the benefit of my daughter is to be divided among my heirs at law according to the laws of the State of Virginia.

"I nominate and appoint my brother, William H. Allison, and my nephew, Warner Moore, my executors, and request that no bond be required of them.

"Witness my hand and seal this second day of October, 1885.

"JAMES W. ALLISON. [Seal.]

"With regard to settling up that business at the Plaster and Sumac Mill, it is my desire and will that Warner Moore should pay to my estate ten *per cent. per annum* for all the money I have advanced and expended in the purchase of the land and putting up the buildings left to Moore, and the cash given him from time to time. That is to say, I want ten *per cent. per annum* in the shape of a rental and interest, on the whole amount expended and furnished by me in the property and for the business—this for each year since the commencement of the business, on the amount at that time expended and advanced.

"And besides this rental I want one-fourth of the net profits of the business after deducting the aforesaid rental or interest. The bequest to Warner Moore is upon the condition that the business is settled up as here directed, otherwise it is to be void.

"Witness my hand and seal this second day of October, 1885.

"JAMES W. ALLISON. [Seal.]"

"New York, Nov. 29, 1892.

"To provide against my sudden death causing injustice to my dear wife, Minnie Clemens Allison, I hereby direct my executor, or executors, to invest one hundred thousand dollars in good income paying real estate or in some safe stocks or bonds, preferably real estate, to be held by my said executor and my brother-in-law, Clemens Jones, as joint trustees for her sole and separate use and benefit during her natural life, and at her death to go to her child or children, if there should be any by me—and if there should be no child or children by me, then to go to my legal heirs. I intend this legacy of one hundred thousand dollars for life to be in addition to the sum of fifty thousand dollars settled upon my said wife, Minnie Clemens Allison, by an ante-nuptial agreement between her as Minnie Clemens Jones and myself, executed at Fairfield, Conn., on or about December 10, 1890.

"As to the remainder of my estate, I wish it to be distributed as directed in a certain letter of testamentary directions written by me to my brother, Wm. H. Allison, from this city on the eve of my departure for Europe, in company with Calderon Carlisle—in the fall of the year 1885, as nearly as I can fix the date—and I appoint my said brother and any one else named as executor in that letter as my executor or executors, and direct that no bond be required of him or them.

"In confirming the directions given in the letter herein referred to, I desire only such changes to be made as will equitably and practically carry out its intentions in case of the death of any beneficiary therein named making a change necessary, and I wish the legal heirs of any such beneficiary to receive such beneficiaries share.

"JAMES W. ALLISON.

"Witness my hand and seal the day and year above written.

"JAMES W. ALLISON.   [Seal.]"

When the paper of 1885 was written the testator was a widower with óne child, the appellee, Mrs. Dora Moore. On December 4, 1890, in contemplation of marriage with the appellant, Mrs. Minnie C. Allison, he settled upon her, in lieu of her dower and distributive share in his estate, the sum of $50,000. On December 10, 1890, the second marriage was consummated; and on June 10, 1894, James W. Allison, the infant appellant, was born of this marriage. On March 25, 1898, the testator died, leaving a large estate, real and personal, and surviving him his widow, his daughter, Mrs. Dora Moore, his infant son, his brother, William H. Allison, his sister, Mrs. E. V. Carson, and the descendants of two deceased sisters.

The first error assigned to the decree of the Chancery Court of the city of Richmond is that "its construction of the residuary clause of the will amounts merely to a declaration of future rights, and not necessary to any present relief to which any party is entitled; and upon the further ground that the persons who may be interested in such decision cannot be brought before the court, may not be in being, and would not be concluded by a decision at this time." The Chancery Court, however, being of opinion that it was proper to hear and determine all questions arising upon the pleadings, overruled this objection.

The assignment of error was waived at the hearing, and is only mentioned in order that the opinion may show what disposition was made of it.

The next question which we shall consider is as to the nature of the limitation of the residuary estate contained in the testamentary paper of October 2, 1885, after the death of Mrs. Dora Moore.

After making certain bequests, the testator gives the residue of his estate, real, personal, and mixed, to executors in trust "for the sole and separate use of my daughter, Dora, wife of

Thomas L. Moore, to have and to hold for her benefit during her natural life, free from the control of her said husband, and at her death to be equally divided among her children, should any survive her—if she should die without issue, or if her surviving child or children should die before becoming of age, then the property bequeathed for the benefit of my daughter is to be divided among my heirs at law according to the laws of the State of Virginia."

The bequest for life of the entire residuum of his estate to his daughter, which is, at her death, to be equally divided among her children, etc., creates a contingent remainder in such children, for, until the death of her daughter, it cannot be ascertained which of her children will survive her, and attain the age of 21 years. See *Howbert* v. *Cawthorn*, 100 Va. 649, 42 S. E. 683, and authorities there cited.

The testator, having thus indicated the direction in which he preferred that his estate should go, then gives expression to his wishes with respect to the property in the event that his daughter should die, and leave no children to survive her and attain the age of 21 years. In that event he declares that he is content that the law shall take its course, and the property bequeathed for the benefit of his daughter be "divided among my heirs at law according to the laws of the State of Virginia." Did the testator intend that this ultimate bequest should be to his heirs at law living at his death, or those who answer that description at the death of the life tenant?

Counsel have, with zeal and discrimination, presented arguments and collated authorities upon each side of this interesting question. We are spared the labor of searching out authority, and only find it necessary to consider and weigh the cases which the assiduity of counsel have supplied.

The object in construing wills is to arrive at the true intent of the testator, but that intent is to be gathered from the language used, for the object of construction is not to ascertain

the presumed or supposed, but the expressed, intention of the testator; that is, the meaning which the words of the will, correctly interpreted, convey. *Wootton* v. *Redd's Ex'r*, 12 Gratt. 206; *Hatcher* v. *Hatcher*, 80 Va. 171; *Waring* v. *Bosher's Adm'r*, 91 Va. 286, 21 S. E. 464.

In construing wills, the words used should be given their ordinary and usual signification; but, where technical words are used, they are presumed to be used technically, and words of a definite legal signification are to be understood as used in their definite legal sense, unless the contrary appears on the face of the instrument. *Waring* v. *Waring*, 96 Va. 641, 32 S. E. 150.

"Like all other legal terms, the word 'heir,' when unexplained and uncontrolled by the context, must be interpreted according to its strict and technical import, in which sense it obviously designates the person or persons appointed by law to succeed to the real estate in case of intestacy." 2 Jarman on Wills (ed. 1881) 585.

With these rules of construction to guide us, we will now consider some of the cases bearing upon this subject.

Language similar to that in the will before us has been the subject of judicial construction in a great number of English cases.

In *Holloway* v. *Holloway*, 5 Vesey, 399, the bequest was to the daughter of the testator for life, and after her decease for such child or children as she shall leave at her decease, in such shares as she should think proper; and in case she shall die, leaving no child (which was the event), then £1,000 to her executors, and the remaining £4,000 in trust for such person or persons "as shall be my heir or heirs at law." It was held that the legacy vested in A, and the other two daughters of the testator, being his coheiresses at law and next of kin at his death; the court holding that words must be understood in their legal sense, unless by the context or express words it plainly appears that it was otherwise intended. It will be observed.

that A, the life tenant, shared with her sisters in the ultimate remainder in her capacity as one of the heirs at law of the testator.

In *Lasbury* v. *Newport*, 9 Bevan, 376, a testator gave his residuary estate to his daughter for life, with remainder to her children, and in default of children to his next of kin. Held, that the class of next of kin was to be ascertained at the testator's death; following *Holloway* v. *Holloway*, *supra*, and distinguishing it from *Briden* v. *Hewlett*, 2 Mill & Kean. 90.

In *Urquhart* v. *Urquhart*, 13 Simons, 613, the testator directed one-half of the interest of his residue to be paid to his daughter and only child, and the other half to his wife, during their joint lives; and that if his daughter survived her mother, or married and left issue, then that the whole of the capital should be paid to her, after his wife's death, but if she died first, without marrying or leaving issue, then that the trustee should accumulate the interest of the residue so far as it was not directed to be paid to the wife, and that on her death one-half of the capital should be divided amongst his nearest of kin, and the other half amongst his wife's nearest of kin. The daughter was the testator's nearest of kin at his death. She died a spinster, before her mother. At the mother's death the testator's sister was his nearest of kin.

Held, that by "my nearest of kin" the testator meant his nearest of kin at his own death, and not at the death of his wife, and consequently that the personal representative of his daughter, and not his sister, was entitled to one moiety of the residue.

It will be observed with respect to this case that the daughter was the life tenant of one-half of the residuum which ultimately passed to her representative, she being the next of kin to the testator at or before his death.

In *Nicholson* v. *Wilson*, 14 Simons, 549, the testator bequeathed a certain sum in trust to his daughter for life, and

after her death to such of his other children as should be living at her death, equally, if more than one, "and if but one child shall be then living, then unto such only child; and if all my children shall be then dead, then I give and bequeath the same unto my personal representative or representatives, and do direct my said trustees and the survivor of them, his executors and administrators, to transfer the same accordingly." At the testator's death his daughter S. and the other children named in the will were his next of kin. S. survived all other children. On S.'s death, M., who was testator's only grandchild, was testator's sole next of kin, and as such she claimed the whole fund.

Held, that the life tenant, S., and testator's other children, as his next of kin at his death, took the fund, instead of its going to M., as testator's sole next of kin at S.'s death. The court said that "though the next of kin of the testator at his decease, and the objects of his gifts, happened to be the same individuals, yet the question must be considered independently of the events that had happened."

In *Ware* v. *Roland,* 15 Simons, 587, the testator bequeathed a fund in trust for his wife and daughter for their lives, successively, with remainder in trust for the children of his daughter, and, if at her death she should leave no child living, in trust to sell the fund and pay A and B £500 each, if they should be alive at that time, and the remainder "to and among his heirs at law, share and share alike." The daughter was the testator's heir at his death. She died unmarried, and it was held that her personal representative was entitled to the fund, as part of her assets.

The bequest here was of a fund in trust for the wife and daughter, but neither that fact, nor that the daughter was the tenant for life, prevented her from taking the ultimate remainder as the testator's heir.

In *Gorbell* v. *Davison,* 18 Bevan, 556, there was a bequest

to A for life, with remainder to B for life, and after their death to their next of kin, but, if no claimant should appear within twelve months after their death, then to charities. A and B were sole next of kin at the testator's death. Held, first, that the next of kin were to be ascertained at the testator's death; and, secondly, that A and B were not excluded from taking under the ultimate gift to the next of kin.

In *Bullock* v. *Downes*, 9 H. L. Cas. 1, the testator, in 1860, after bequest to different members of his family, gave the residue to three persons in trust to pay the dividends to his son for life, and after the son's decease to any widow of his an annuity of £600 for life, and the residue to his son's children, and, in case there should not be any child of the son, then to stand possessed of the same, in trust for such person or persons of the blood of me, as would by virtue of the statute of distributions of intestates' effects have become, and would then have been entitled thereto, in case I had died intestate." At the testator's death he left four daughters and a son. The son married, enjoyed the dividends of the residue during life, and died without ever having had a child.

Held, that the word "then," even if treated as an adverb of time, referred only to the time when the persons entitled would come into possession of what had been bequeathed to them, that the persons entitled were to be ascertained at the death of the testator, that the son was one of those persons, and that his right as one of the next of kin was not affected by the previous gift of a life interest in the whole of the residue, so that on the death of the son without issue the residue became divisible into five shares, of which his personal representative took one, and his sisters the other four.

No case could be of higher authority than this, and it was followed as late as 1897, in *Patten* v. *Sparks*, a syllabus of which is given in 15 Mews. Eng. Digest, at page 933.

We find, therefore, the law finally established in Great Bri-

tain by a line of decisions running from *Doe* v. *Lawson,* 3 East, 278, decided in 1803, to the case last cited, in 1897. See also *Doe* v. *Maxey,* 12 East, 589 ; *Smith* v. *Smith,* 35 Eng. Ch. 317 ; *Boydell* v. *Golightly,* 37 Eng. Ch. 327 ; *Wrightson* v. *Macauley,* 14 Mee. & Wel. 214 ; *Seiffert* v. *Badham,* 9 Bev. 370 ; *Murphy* v. *Donegan,* 3 Jones & La. T. 539 ; *De Beauvoir* v. *De Beauvoir,* 3 H. L. Cas. 523.

There have been, it is true, from time to time, decisions which are not in harmony with the current of authority. We shall not undertake to reconcile them, or to offer any opinion as to the sufficiency of the peculiar circumstances by which they have been discriminated from the cases we have quoted. There can be no doubt that the established law of England is in harmony with the principles enunciated in *Bullock* v. *Downes.* This is conceded by 2 Redfield, 92, note 104; and Jarman on Wills (6th Am. Ed.), p. 986, expresses the opinion "that at the present day it is not probable that such decisions will be made as those in *Briden* v. *Hewlett* and *Butler* v. *Bushnell*," which are among the cases to which we refer in general terms as being out of harmony with the established rule in England.

Coming now to the American authorities, we find that the Supreme Court of Illinois, construing a will by which the testator devised his estate to executors in trust, and after making provision for his widow, and some charitable bequests, directed that the remainder of his estate, real and personal, should be so managed and disposed of that one-half of the income thereof should be paid to his daughter during her life, with remainder to her children, should she have any, and, in case of her death without issue, her share should go to and descend to his heirs at law, and gave his son the residue of his estate, the income thereof until he should attain the age of thirty years, and then the whole of his share. The son and daughter both died after the probate of the will, without issue, the son dying first. It was held that the heirs at law who were to take

the share of her daughter after her death without issue were the son and daughter of the testator who were living at the time of his death, in the absence of anything in the will to show a contrary intention. *Kellelt* v. *Shepard*, 139 Ill. 433, 28 N. E. 751, 34 N. E. 254.

In *Buzby's Appeal*, 61 Pa. 111, the testator devised to his son "for life and from and immediately after his decease, then for the use and behoof of all and every child and children of said son that shall then be living and the lawful issue of such as shall be deceased, and for want of such child or children or lawful issue, then in trust for the use and behoof of my right heirs forever." The son died unmarried and without issue. Held, that he took an estate for life, and that the remainder in fee to the children and issue of those deceased was contingent. Held, also, that the heirs of the testator who were living at his death took under the last limitation.

In that case the court refers to the rule as laid down by Redfield on Wills, who says: "The devise or bequest of property to the testator's heirs at law means those who were such at the time of his decease, unless a contrary intent is obvious. But where there are intervening estates, and the remainder is contingent, it will be construed as having reference to those who shall sustain the relation of heirs at the time the estate vests in possession." In support of this doctrine, Redfield cites a number of Massachusetts cases, and among them *Abbott* v. *Bradstreet*, 3 Allen, 587, and *Sears* v. *Russell*, 8 Gray, 86. The Pennsylvania court observes that "the general rule is recognized in *Sears* v. *Russell*, and strictly followed in *Abbott* v. *Bradstreet*, and neither of them suggests any such modification of the rule as that stated by Mr. Redfield," and concludes as follows: "The limitation to the heirs must be construed to mean those who are such at the testator's death unless a different intent clearly appears. Whether the remainder be regarded as contingent or vested, the heirs of the testator who were living at his death are entitled to it under the limitation."

The English and Massachusetts cases to which we have referred were examined, and the conclusion reached that the heirs should be ascertained at the testator's death.

In *Abbott* v. *Bradstreet*, 3 Allen, 587, a bequest of the remainder after a life estate to the heirs at law of the testator was construed as referring to those who were such at the time of his decease, unless a different intent was plainly manifested; and that such intent was not to be inferred from the fact that those to whom the life estate was given were among his heirs at law, or that a bequest was given to another heir at law "in full of any share she may be entitled to out of my estate." Judge Hoar delivered the opinion of the court: He reviews a number of English decisions, and reaches the conclusion that the doctrine announced in *Holloway* v. *Holloway*, *supra*, may now be considered as the law of England, and says that the English cases to the contrary are recognized as exceptional, and resting upon special circumstances indicative of intention.

In *Whall* v. *Converse*, 146 Mass. 345, 15 N. E. 660, the testator, by his will, gave the income of a trust fund to his wife until her death or marriage, and, in either event, to his son and daughter; the principal, if the wife survives them and their issue, if any, to go on her death as she may direct by will, or, in default of a will, "then to my heirs at law." The bequest over is to the heirs of the testator at the time of his death.

Judge Holmes delivers in that case a brief opinion, in which he states the law, and the reason for it, in terse but yet comprehensive terms: "The general rule is settled, that, in case of an ultimate limitation like that of the fund in question to the testator's heirs at law, the persons to take are those who answer the description at the time of the testator's death. . . . *Abbott* v. *Bradstreet*, 3 Allen, 587. The reasons for this rule are that the words cannot be used properly to designate anybody else; that such a mode of ascertaining the beneficiary implies that the testator has exhausted his specific wishes

by the previous limitations, and is content thereafter to let the law take its course."

In *Rotch* v. *Rotch*, 173 Mass., at page 125, 53 N. E. 268, the testator, by his will, directed that there be deposited a sum of money for each of his three daughters, the income to be paid to each for life, and upon the decease of each the deposit to be paid over to her children then living, and, in default of any lawful issue then living of such daughter, to be paid over "to my heirs at law as part of the residue of my estate, in the manner hereinafter directed concerning the same." He made a similar provision for each of his two sons; the fund, in default of issue, to be paid over "to my heirs at law, as hereinafter provided." The testator also directed that the residue of his estate be divided into so many equal shares that there might be one share set aside for "each of my children then living"; giving one share to each of his sons absolutely, and one share for each of his daughters, in trust, to pay the income to her during life, and on her decease to convey the trust property to her issue, and in default of issue to convey the same "to my heirs at law, to hold the same to them, their heirs, executors, administrators and assigns forever." E., one of the daughters, died after the testator's death, unmarried and without issue, leaving a will, under which C. was the executrix and residuary legatee. Before the death of E. the interest of her deceased brother had been sold to her and to the three other surviving children of the original testator, in equal shares. Held, that those persons took the remainders given to the testator's "heirs at law" who were his heirs at his decease; that C., as executrix and residuary legatee, and aside from the purchase of the share of the deceased son, was entitled to receive a one-fifth part of the fund invested for E., and no more; that the share of the residue held in trust for E. by the trustee before her death was to be divided into four equal shares for the benefit of her surviving brother and two sisters and C.; and

that the shares of the two sisters, as well as those of the brother and C., were to go to them absolutely, free of trusts.

In the course of its opinion the court said: "The slightest reflection would show a testator that, if he wished that, of such of his children as might be living at his death, none should have power over the trust property unless they were living when the particular estates fell in, he must do more than provide simply that the remainders should go to his heirs at law, whom he expected, or at least hoped, would be all his five children. Nor do we see anything in the general scheme of the will or in its other provisions which shows us that, in the clauses which we are to construe, the testator meant by the words 'to my heirs at law' his heirs to be determined as of any other time than as of the time of his own death."

This case would seem to be sufficient to establish the law of Massachusetts, but appellees place great reliance on *Heard* v. *Read*, 169 Mass. 216, 47 N. E. 778. In that case the testator gave his daughter the residue of his estate, including the reversion in the dwelling house to trustees to pay a net income to the daughter for life, and, "at and after the decease of my said daughter, I give the said trust premises to her issue, equally to be divided between and among them, if more than one, in fee simple, the children of any deceased child of my said daughter to take the parent's share by representation. If my said daughter shall leave no issue surviving her, the trust premises shall, at her decease, be divided into two equal parts or portions, one of which part shall go to and be held by the said John T. H. and his heirs in fee forever, and the other part shall be divided among my heirs at law as though I died intestate."

Considering all the provisions of the will, a majority of the court were of opinion that the testator had in mind the heirs at law living at the time of the daughter's decease, when the one-half interest was to be divided among his heirs at law.

How many of the judges dissented, or who they were, does not appear. The case cannot be reconciled with other decisions of the same court which precede and follow it.

We come now to consider the Virginia authorities bearing upon this subject. In the case of *Stokes* v. *Van Wyck*, 83 Va. 724, 3 S. E. 387, the testator, dying in 1834, by his will limited an estate in fee to his daughter, Mrs. W., for her life, with remainder to her issue in fee, and in default of issue to his own heirs. At the time of testator's death, Mrs. W. was his sole heir. In 1857 she sold and conveyed the estate. In 1884 she died without ever having had issue, and in ejectment by S. and others, who were testator's heirs living at Mrs. W.'s death, against her grantees, to recover the estate, it was held that her grantees acquired perfect title by her conveyance.

In that case the court, in the course of its opinions, applying the law in force at the death of the testator, held that the rule in *Shelley's Case* controlled, by virtue of which Mrs. W. took an estate tail, converted by our statute into a fee simple. "But that fee-simple estate was determinable by her death without issue then living, with a limitation over in that case to the heirs of the testator, William Boush." This estate tail, thus enlarged by statute into a fee simple, having determined by the death of Mrs. Walke without issue living at her death, it became necessary to ascertain in which of the heirs of the testator the title vested under the terms of the will—the heirs living at the death of the testator in 1834, or those living at the death of the life tenant in 1884. Upon this point, says the court: "She (Mrs. Walke) was the only child and heir living at the date of the testator's will, and at his death she was to him the nearest and dearest, and was unquestionably the chief object of his affection and bounty. The testator therefore limited the estate, first, to her and her husband for life, and to the survivor for life; and, secondly, to her issue. But if she had no issue, then it would seem that he naturally

would, lastly, prefer her—his only child and right heir—to others not so near in blood and affection, and give the estate to her absolutely, without limitation or restriction, to do with as she pleased. Such would be the natural conclusion, in the absence of anything in the will to the contrary, if we were driven to the ties of blood as they are known in the common experience of men, and were not confined to the will itself, to be read and interpreted in the light of well-settled legal principles." Discussing the will, the court saw nothing in the language used by the testator inconsistent with this natural inclination of a father to send his property along with his affection for his daughter and only child.

In that case the limitation was to the testator's heirs, and it was argued, therefore, that he intended a plurality of persons, and, as he had only one heir living at the time of his death, he must have referred to some other period for the ascertainment of his heirs; but the court was of opinion that there was nothing favorable to the plaintiffs in error in the testator's use of the plural word "heirs," and that its use could not exclude the idea that the testatorial intent was to limit the estate to the daughter, who was the sole "heir," for where there is a gift to the heir (in the singular), and there is a plurality of persons conjointly answering to the description of "heir," all are held to be entitled, and the converse is held to be true. 2 Lord Raymond, 829.

A number of English cases upon both sides of this question, some of which we have considered, are discussed in the opinion of the court, the Virginia cases up to the date of that decision are referred to, and the conclusion was reached that in England the rule which requires the heirs to be ascertained at the death of the testator, and not at the death of the life tenant, unless plainly controlled by the language of the instrument under construction, is fully settled in England, and that, while there had been no decisions in Virginia on the precise question at

that time, the principle had been recognized and applied in analogous cases; citing *Hansford* v. *Elliott*, 9 Leigh, 79; *Catlett* v. *Marshall*, 10 Leigh, 79; *Martin* v. *Kirby*, 11 Gratt. 67; *Brent* v. *Washington's Adm'r*, 18 Gratt. 526; and *Corbin* v. *Mills' Ex'rs*, 19 Gratt. 472.

Quite a number of decisions by this court since the case of *Stokes* v. *Van Wyck*, *supra*, have been cited. We have examined them, and can find nothing which militates against the current of opinion as established by the English cases, by those from Illinois, Pennsylvania, and Massachusetts, and the rule applied in *Stokes* v. *Van Wyck*.

It is not contended that in any of the later cases the precise point here under consideration was adjudged, and a discussion of the more or less analogous principles which they illustrate would throw no such light upon the case before us as would justify an expansion of this opinion.

Ever mindful of the rule that the intention of the testator must prevail, that that intention is to be gathered from the language used, and that only technical words are to receive technical construction, and Lord Coke's maxim "to judge as near as may be according to the rules of law," we can find nothing in the language of the testator which controls the rule of construction established by the overwhelming weight of authority in England and this country.

Having reached the conclusion that the heirs are to be ascertained as of the death of the testator, it remains for us to determine the nature of the interest which they take under this clause.

Is the ultimate remainder to the heirs vested or contingent? We have already said that the limitation after the termination of the life estate to Mrs. Moore "to her children, should any survive her, if she should die without issue, or if her surviving children should die before coming of age," created a contingent remainder in such children—a contingent remainder in fee. It

follows that "no after limitation dependent upon it can be a vested one." Wash. on Real Property, Vol. 2 (3d ed.), p. 535. That author, at page 534, says: "Notwithstanding a remainder limited after a remainder in fee would be void, yet two remainders may be so limited, though each a fee, as to be good, provided this is so done that only one is to take effect; the one being a substitute for, and not subsequent to, the other. The consequence is that, if the first takes effect and becomes vested, the other at once becomes void. Such limitation is said to be of a fee with a double aspect."

2 Minor's Inst., p. 418, is to the same effect: "Where the intervening contingent remainder is less than a fee simple, the remainder limited afterwards will be vested or contingent according to the terms of the limitation. There is no necessity, in the nature of things, that it should be contingent." Fearne's Rem. 223 *et seq.*

"Where there is a contingent limitation in fee simple absolute, no estate limited afterwards can be vested." Fearne's Rem. 225, 229-30."

"It is possible, however, even at common law, to limit two concurrent fees, by way of remainder, as substitutes or alternatives, one for the other; the latter to take effect in case the prior one should fail to vest in interest." 2 Minor's Inst., p. 394.

The law as thus stated by eminent text-writers is abundantly fortified by adjudged cases to which they refer.

We are, therefore, of opinion, with respect to the residuary clause, that it creates a life estate in Mrs. Dora Moore, a contingent fee in her child or children, and, upon a failure of these intervening estates, the ultimate remainder, which is up to that time contingent, will vest in those who were the heirs at law of the testator at his death.

Mrs. Minnie C. Allison, widow of testator, claims that she is entitled to share in the distribution of her husband's estate

among "his heirs at law according to the laws of the State of
Virginia."

The decree of the Chancery Court was adverse to her claim,
and in her petition for appeal her counsel lays down, as propo-
sitions settled by the authorities, first, that, upon a limitation
of real property to "heirs," the right heir, only, will take;
secondly, that upon a limitation of personal property alone to
"heirs," the word "heirs" will be construed as "distributees,"
and the personalty will, under such a limitation, pass to those
entitled under the statute of distributions.

From those principles, counsel deduce the conclusion that,
where there is a blended gift of realty and personalty in one
clause to heirs, the word "heirs" will be construed distribu-
tively, and will mean right heirs, so far as realty is concerned,
and will mean distributees, with respect to the personalty;
that this is in accordance with the ancient rule of construction,
*reddendo singula singulis.* In other words, the word "heirs"
will be construed distributively, according to the nature of the
two kinds of property; right heirs taking the realty, and dis-
tributees taking the personalty.

The two principal propositions correctly state the law, but
we cannot assent to the corollary deduced from them. The
property which passes ultimately to the heirs at law of the
testator is the residuum of his estate—real, personal, and
mixed. At the date when the will in which this clause appears
was written, the testator was a widower. He was again mar-
ried, years after the execution of this will; and his widow could
not, therefore, have been within the contemplation of the tes-
tator when it was written. The codicil which bears date No-
vember 29, 1892, was made, as it declares upon its face, in
order that his sudden death might cause no injustice to his
wife. He, therefore, directed his executors to invest $100,000
in good, incoming-paying real estate, or in safe stocks or bonds,
to be held by his executors and brother-in-law as joint trustees

for her sole use during her life, and at her death to go to her child or children, and, if there should be no child or children of the marriage, then to his legal heirs. As to the remainder of his estate, he declares that he wishes it to be distributed as directed in accordance with a "certain letter of testamentary directions written by me to my brother, William H. Allison, on the eve of my departure for Europe," which is the will bearing date October 2, 1885, and adds: "In confirming the directions given in the letter herein referred to I desire only such changes to be made as will equitably and practically carry out its intentions in case of the death of any beneficiary named therein making a change necessary." The will, of course, speaks as of the death of the testator; but in construing it we are permitted to place ourselves, as near as may be, in the situation of the testator. We must look to the principal will, which bears date October 2, 1885, to the codicil of November 29, 1892, and, in the light of the facts disclosed in the record bearing upon those dates, give effect to the language in which the testator has clothed his will. Looking to his environment in 1885, it is impossible that he could have foreseen his second marriage, and his death, leaving a widow to survive him; and, as we have already said, he could not have contemplated her participation in the residuum of his personalty as one of his distributees. If the will had been silent upon the subject, the inference would have been that, as he made no change in the will of 1885, it was to be modified by that of 1892 only so far as the first was inconsistent with the last expression of his will. This necessary conclusion, however, is fortified by the express direction which he gives that only such changes are to be made as will carry out his intention as declared in the first will in case of the death of any beneficiary therein named. A resort, therefore, to the circumstances surrounding testator at the date of either will or at his death, gives no encouragement to the widow's claim to share in the distribution of the residuum as one of the distributees under the law.

The text-books and adjudged cases upon the subject seem, also, to be adverse to her contention.

In *De Beauvoir* v. *De Beauvoir*, 3 H. L. Cas. 523, the testator devised and bequeathed his real and personal estate to three persons, E., C., and R., in succession, and to their sons, successively, in tail male, "and for default of such issue I give and devise the same to my own right heirs forever." At date of testator's death, R., last tenant for life, was testator's heir at law, while McD. was testator's sole next of kin. McD. then died, when her personal representative filed a bill against R., claiming the whole of testator's personal estate for McD., deceased, as testator's sole next of kin, while R. claimed that, should he die without a son, the whole of testator's personal estate would belong absolutely to him, as heir at law.

Held that, on the face of the will, it was the intention of the testator to make the two funds (i. e., real and personal) a blended property, and to give them the character of real estate, and to make both properties go together, and to give both to persons expressly designated.

The Lord Chancellor, in his opinion, says: "One class of this property he (R.) does not take in the character of right heir, but, being the right heir, he takes it as a gift under this will. It is perfectly clear that, if the personal property is given to him expressly, he will take it. The words are not used in two senses, but they are used in one sense, to carry both properties according to the intention. When the law, either by its own force, or in pursuance of the intention of the testator, to be collected from the will, carries the property, under those words, to the same person, there are not two senses put upon the same words, but the right heir takes both properties; whereas only one of those properties would necessarily devolve upon him; both would not, unless the testator had so expressly directed.  .  .  .

"As far, therefore, as the authorities go with respect to per-

sonal estate, whether the gift be an immediate gift, or whether it be a gift in remainder, the cases appear to be uniform—to give to the words the sense which the testator has impressed upon them—that if he has given to the heir, though the heir would not by law be the person to take that property, he is the person who takes as *persona designata*. It is impossible to lay down any other rule of construction. Then we come to the mixed cases. I quite agree that as to them the argument is still stronger against the appellant (testator's next of kin), for if the law is settled when you can collect the intention, as regards personal estate, the argument that it is so must, *a fortiori*, have more operation when you come to blended property, consisting of real and personal estate; for as to so much of the property as consists of real estate there can be no doubt or question but that the person who is described as heir is intended to take in that character. You, therefore, at once, in speaking of heir, impress upon the gift, or upon him who is to take it, his own proper character—that of heir. When you are dealing, therefore, with the same disposition, though of another part of the property, you are relieved from the difficulty which you labor under in the more naked case of personal property, and, having found that the testator meant what he has expressed as regards that portion which is real property, you may more readily infer the same intention as regards other portions of the same gift depending upon the same words, and you, therefore, allow the whole disposition the same operation as you would give to it if it had been confined to real estate alone. The authorities here again are perfectly conclusive as far as they go. There is nothing on the other side."

*Gwynne* v. *Muddock*, 14 Vesey, 488, referring to the rule of *reddendo singula singulis*, says that "the testator could not mean that the next of kin should take the personal estate, for he blends all the real and personal estate together, and, after the death of A., directs that his nighest heir at law shall enjoy

the same.   As both are to be enjoyed together, it is absolutely necessary for the court to say who shall enjoy both.   It would be contrary to the intention to divide them, and it would be contrary to the words to give the whole to the next of kin. Therefore, the court has no alternative but to adhere to the words of the will, and permit the person who answers to the description of heir at law to enjoy the whole."   *Boydell* v. *Golightly, supra*; *Ware* v. *Rowland, supra.*

The rule established in *De Beauvoir* v. *De Beauvoir, supra*, was followed in *Haslewood* v. *Greene*, 28 Bevan, 1, and in *Smith* v. *Butcher*, 10 Ch. Div. 113.

Our attention has been called to a number of American cases upon this subject.   Among them, *Clarke* v. *Cordis*, 4 Allen, 466, merits particular attention.   The testator devised and bequeathed the residue of his real and personal estate in trust for the benefit of his four sons for life, and, on the death of all his sons, then said real and personal property to be conveyed and assigned to the "legal heirs of my said four sons respectively in equal proportions by right of representation, and their respective heirs, executors, administrators and assigns forever."

Held, that the word "heirs," if there is nothing in the will to show that the testator intended otherwise, will be construed according to its common-law interpretation, and will not include those who would be entitled to a share of the personal estate under the statute of distribution.

In the course of the opinion, the judge, after stating that the property which passed under the devise to the heirs of his sons embraced both real and personal estate, says:   "Both species of property are to be held and enjoyed together by the same persons.   They cannot be divided so as to vest the personal property in one class of persons and the real estate in another. It is therefore necessary to adhere to the words of the will, and to permit those persons who are technically described as legal heirs to take the whole."   *Heard* v. *Read, supra.*

Among the text-writers, 2 Jarman on Wills, 610, after construing many cases in which the word "heirs" has been construed to mean next of kin, adds: "It need not be pointed out that in all the foregoing cases special grounds were assigned for departing from the proper sense of the word 'heirs'; and they will not be understood to warrant the general position that the word 'heirs,' in relation to personal estate, imports next of kin, especially if real estate be combined with personalty. in the same gift."

2 Williams' Exors. 970, is to the same effect: "But when the word 'heir' is used, not to denote succession or substitution, but to describe a legatee, and there is no context to explain it otherwise, it would seem that there is no room to depart from the natural or ordinary sense of the word 'heir.' . . . . *A fortiori*, the heir, properly and technically speaking, may take personal property bequeathed to him by that description when the intention of the testator in his favor appears upon the construction of the whole will, as where it is blended in the gift with real estate."

1 Roper on Legacies is still more to the point: "It being always a question of intention as to the meaning of the testator in the use of the word 'heirs,' if it appear that the intent was for the heir, properly and technically such, to take the personal estate, there can be no objection to his title. An instance of that intention may occur when a testator blends his real and personal estate together, and, after giving the fund to a person for life, directs that his next heir at law shall afterwards succeed to it. In this case, the intention that both estates should be enjoyed together is apparent, and to divide them by giving the one to the next of kin would be contrary to the words; consequently a court of equity has no alternative but to adhere to the description in the will, and to permit the person answering that description, viz., the heir at law, to enjoy the whole."

So in 4 Kent's Com. 537: "But if real and personal estate

be devised, after a life estate, to the heirs at law, both the next of kin and the heir at law cannot take, if it appears both descriptions of property were to go together; and then the heir will take the whole."

And in 2 Redfield on Wills: "But where real and personal estate is blended in the same bequest, there seems an inconsistency in giving the word 'heir' or 'heirs' a different import with reference to the different subject-matters combined in the same general disposition. This difficulty is referred to in some of the earlier cases. But the question was thoroughly reviewed, and all the cases bearing on this point considered, in the case of *De Beauvoir* v. *De Beauvoir*, and the rule fully established that in all such cases the word 'heir' or 'heirs' must receive its natural and ordinary import and construction."

We are aware that in some of the States a different rule has been established, but, in the absence of decisions of this court upon the subject, we are content to accept the law as declared by the English Court of Chancery, the Supreme Court of Massachusetts, and the eminent text-writers from whom we have quoted.

We are, therefore, of opinion that, as the residuary clause of the will blends real and personal estate and gives it to the heirs at law of the testator, the persons answering that description should enjoy the whole, there being nothing to indicate a contrary intention on the part of the testator.

By the codicil of November 29, 1892, the testator bequeathed to his wife for life $100,000, "at her death to go to her child or children, if there should be any by me, and if there should be no child or children by me, then to go to my legal heirs."

Some time prior to the testator's death there was born to him a son, James W. Allison, Jr., and our next inquiry shall be whether he took a vested or contingent remainder after his mother's death in the legacy of $100,000.

Still keeping in mind the rules of construction already men-

tioned, we invoke one other, which may be considered as fully established by this court.

Words of survivorship are to be construed as referring to the testator's death rather than to that of the life tenant, unless a special intent to the contrary appears upon the face of the will; and that if, upon a fair construction of the whole will, there is a doubt as to the character of the remainder, the courts will hold it to be vested rather than contingent, in order that the estate or interest may vest at the earliest moment consistent with the terms of the instrument to be construed. *Hansford* v. *Elliott*, 9 Leigh, 79 ; *Martin* v. *Kirby*, 11 Gratt. 67 ; *Cooper* v. *Hepburn*, 15 Gratt. 551; *Stone* v. *Lewis*, 84 Va. 474, 5 S. E. 282; *Neilson* v. *Brett*, 99 Va. 673, 40 S. E. 32; *Chapman* v. *Chapman*, 90 Va. 410, 18 S. E. 913.

In *Gish* v. *Moomaw*, 89 Va. 345, 15 S. E. 868, the principle is thus stated at page 371, 89 Va., and page 876, 15 S. E. : "Words of survivorship refer to the death of the testator, unless there be something in the context of the will to demonstrate an intention to make them refer to the death of the life tenant."

In *McComb* v. *McComb*, 96 Va. 779, 32 S. E. 453, it is said : "The settled rule of interpretation in this state is that all devises and bequests are to be construed as vesting at the testator's death, unless the intention to postpone the vesting be clearly indicated by the will."

In *Waring* v. *Waring*, 96 Va. 641, 32 S. E. 150, a devise to a son "during his natural life, and at his death to his children," was held to create a vested remainder in each of the children which was unaffected by a subsequent clause of the will devising the estate over in the event of the death of the son without lineal descendants living at his death, the son having left such descendants.

"The present capacity to take effect in possession if the possession were to become vacant, and not the certainty that the

possession will become vacant, before the estate limited in re-
mainder determines, universally distinguishes a vested remain-
der from one that is contingent." Fearne's Remainder, 215;
*Crews' Adm'r* v. *Hatcher*, 91 Va. 381, 21 S. E. 811.

"It is the uncertainty of the right of enjoyment, and not the
uncertainty of its actual enjoyment, which renders a remainder
contingent. The present capacity of taking effect in possession,
if the possession were to become vacant, distinguishes a vested
from a contingent remainder, and not the certainty that the
possession will ever become vacant while the remainder con-
tinues." *Williamson* v. *Field's Ex'rs*, 2 Sandf. Ch. 533.

In the will before us a life estate is given to Mrs. Allison,
"and at her death to go to her child or children if there should
be any by me." At the death of the testator this bequest at
once vested in the trustees for her benefit during her natural
life. James W. Allison, Jr., her child, was then in existence,
and at her death, at any moment of time, the remainderman
stood ready to go into possession and enjoyment of the legacy.
There was never any uncertainty as to the remainderman's
right of enjoyment; there was an uncertainty as to his actual
enjoyment of it, but there has been in the son, from the moment
of his birth, a capacity to enter at once upon the enjoyment of
the remainder immediately upon the determination of the pre-
cedent life estate.

We have found the rule no better stated than in *Moore* v.
*Lyons*, 25 Wend. 119: "Where a remainder is limited to take
effect in possession, if ever, immediately upon the determination
of a particular estate, which estate is to determine by an event
that must unavoidably happen by the efflux of time, the re-
mainder vests in interest as soon as the remainderman is *in esse*
and ascertained, provided nothing but his own death before
the determination of the particular estate will prevent such re-
mainder from vesting in possession; yet, if the estate is limited
over to another in the event of the death of the remainderman

before the determination ·of the particular estate, his vested estate will be subject to be devested by that event, and the interest of the substituted remainderman, which was before either an executory devise or a contingent remainder, will, if he is *in esse* and ascertained, be immediately converted into a vested remainder."

Fitting the rule as here announced to the will before us. it is plain that the remainder is limited to take effect in possession immediately upon the death of Mrs. Allison, an event which must unavoidably happen by the efflux of time. The remainderman is in being and ascertained, and nothing but his own death before the determination of the particular estate will prevent the remainder from vesting in possession in him.

There is nothing in the case of *Howbert* v. *Cawthorn*, 100 Va. 649, 42 S. E. 683, at variance with the authorities ·we have cited. In that case there was a devise by the testator for the use of his wife, with remainder in fee simple to his children living at her death, and the descendants of such as might be dead, and, if there should be no children or descendants living at the death of the wife, then to certain persons named. Held, that the remainderman who would take after the termination of the life estate could not be ascertained until the death of the life tenant, and therefore a child had no vested interest during the life-time of the mother, but only a contingent remainder.

The court was of opinion that the limitation was to the children who survive the life tenant, which, of course, could not be ascertained until her death.

The distinction between *Howbert* v. *Cawthorn* and the case under consideration will plainly appear by reference to a quotation from Washburn on Real Property (3d ed.), sec. 1, pars. 17, 18, top pages 507, 510:

"The present capacity of taking effect in possession, if the possession were now to become vacant, and not the certainty that the possession will become vacant before the estate limited

in remainder determines, universally distinguishes a vested remainder from one that is contingent. By capacity, as thus applied, is not meant simply that there is a person *in esse*, interested in the estate, who has a natural capacity to take and hold the estate, but that there is, further, no intervening circumstance, in the nature of a precedent condition, which is to happen before such person can take. As, for instance, if the limitation be to A for life, remainder to B, B has a capacity to take this at any moment when A may die. But if it had been to A for life, remainder to B after the death of J. S., and J. S. is still alive, B can have no capacity to take until J. S. dies. When J. S. dies, if A is still living, the remainder becomes vested, but not before."

In *Howbert* v. *Cawthorn* the children who were to take were in being, but the possession could only vest in them in the event of their surviving their mother, an event which could not be ascertained until the mother's death. There was no time during the existence of the life estate when there was any person in being with capacity to take the estate in possession, should the possession become vacant. Only those children were clothed with the capacity of enjoying the remainder in possession who survived the wife, which could not be ascertained until the death of the wife. Here, then, was an intervening circumstance, in the nature of a condition precedent, which was to happen before the children could take in that case.

In this case the period of survivorship has been fixed at the death of the testator, and not that of the life tenant. If the language of the will had been as it is inadvertently stated to be in the brief of one of the learned counsel, if the testator had made the bequest to his widow for life, and then to go to her child or children, "should there be any by me at her death," the argument in favor of survivorship at the death of the life tenant would have been much more persuasive; but what the testator did say is very different. He gives the life estate to

his widow for her natural life, "and at her death to go to her child or children if there should be any by me." The condition is obviously annexed to the actual enjoyment of the gift, and not to the right of enjoyment. *Williamson* v. *Field, supra.*

We are of opinion that James W. Allison, Jr., took a vested remainder in the bequest of $100,000 to trustees for the benefit of Mrs. Allison for life, with remainder to her child or children.

At the date of the will and codicil, Mrs. Dora Moore was the only child of the testator. After making the codicil of November 29, 1892, there was born to him a son, James W. Allison, Jr., who claims to be a pretermitted child, and invokes for his protection section 2528 of the Code of 1887, which is in part as follows:

"If a will be made when a testator has a child living, and a child be born afterwards, such after-born child, or any descendant of his, if not provided for by any settlement, and neither provided for nor expressly excluded by the will, but only pretermitted, shall succeed to such portion of the testator's estate as he would have been entitled to if the testator had died intestate."

We have before us a will made when the testator had a child living. There was a child born to him afterwards, which child was not provided for by any settlement, nor expressly excluded by the will, and we are left to inquire whether he was "provided for" or "only pretermitted."

We have seen that James W. Allison, Jr., as one of the heirs of the testator living at his death, takes a contingent remainder in one-half of the residuum of the estate after the death of the life tenant, Mrs. Moore. We have seen that he takes a vested remainder in the legacy to trustees for the benefit of his mother for life, and at her death with remainder to her child. Do these remainders constitute such a provision for the after-born child as is contemplated by section 2528 of the Code of 1887?

"A vested estate gives a certain and fixed right of present or

future enjoyment; that is, an interest clothed with a present legal and existing right of alienation."

"An interest when vested, and whether it entitles the owner to the possession now or at a future period, is fixed and present; so that the right of ownership over the land or other subject of property, to the extent of the estate, may be aliened." 1 Preston, Est. 65.

"A vested remainder is as truly a present fixed property or ownership as is an estate in possession." 3 Pom. Eq., sec. 1286.

In *Jackson's Adm'r* v. *Sublett*, 10 B. Mon. 467, it is said: "The person entitled to a vested remainder has an immediate, fixed right of future enjoyment, that is, an estate *in præsenti*, though it can only take effect in possession and pernancy of the profits at a future period."

In *Poor* v. *Considine*, 6 Wall. 458, 18 L. Ed. 869: "A vested remainder is where a present interest passes to a certain and definite person, but to be enjoyed *in futuro.*"

It is needless to cumulate authorities upon this subject. The existence of the present right, as distinguished from its future enjoyment, is an inherent, an essential quality of all vested remainders.

We shall not attempt to estimate the present value of the remainders, one vested and the other contingent.

The statute does not require the testator to make provision for the child by placing him upon a footing of equality with other children or objects of his bounty, and the provision need not be adequate to his maintenance, education, and support. The section under consideration imposes no limitation upon the power of the parent; it merely declares how he shall exercise the unquestioned right to dispose of his property by will as he sees fit. This plainly appears from the language of the statute, for the testator may exclude the after-born child from all participation and enjoyment of any part of his property, but the intention to do so must be expressed. To pretermit is to pass

by, to omit, to disregard. If the intention to exclude appears upon the face of the will, the child has not been omitted or passed by. If the child has been provided for by the will, the value of the provision is not the subject of inquiry by the court, for, however inadequate the provision may be, it would yet be true that the child was not pretermitted, had not been omitted, passed by, or disregarded. Such seems to be the plain language of our statute.

Decisions from other States construing statutes peculiar to their own jurisdiction give us but little aid.

In *Hockensmith* v. *Slusher*, 26 Mo. 237, the court, construing the statute concerning pretermitted children, says that its object is "to produce an intestacy only when the child or the descendant of such child is unknown or forgotten, and thus unintentionally omitted; and the presumption that the omission is unintentional may be rebutted when the tenor of the will or any part of it indicates that the child or grandchild was not forgotten. The statute extends only to a case of entire omission, and the mention of a child, without a legacy or other provision for him, is sufficient to cut him off from a distributive share of the estate; and whenever the mention of one person, by a natural association of ideas, suggests another, it may reasonably be inferred that the latter was in the mind of the testator, and was not forgotten or unintentionally omitted. Thus it has been decided that by the mention of a daughter, though dead at the time of making the will, it will be inferred that her children are not forgotten. The mention of grandchildren will exclude the parent. Naming a son-in-law is sufficient to show that the daughter was brought to the recollection of the testator, and naming two grandchildren will indicate that their brothers and sisters not named were intentionally omitted." *McCourtney* v. *Mathes*, 47 Mo. 533.

*In re Minot*, 164 Mass. 38, 41 N. E. 63, it was held: "There is no omission to provide by will for children, if there should be

any living at the testator's death, within the meaning of Pub.
St. 1882, c. 127, sec. 21, if, after a bequest to his wife, whom
he knew to be pregnant at the time of making the will, he gave
the whole of the rest of his property to a trustee to pay the
whole income to the wife during her life, and the reversion to
those who, at the time of her death, would be her heirs at law
by blood."

In *Meares* v. *Meares' Ex'rs*, 26 N. C. 192, the court uses the
following language: "The statute only provides for the case
where the parent dies without having made provision for the
child; which means, without making any provision. For the
act does not mean to judge between the parent and child as to
the adequacy of the provision he may choose to make, but only
to supply his accidental omission to make one."

In *Stevens* v. *Shippen*, 28 N. J. Eq. 535, construing a similar
statute, it is said: "The Legislature surely did not intend to
compel a testator to admit an after-born child to an equal share
of his property with his other children, under all, if not pro-
vided for by what is technically known as a settlement; for it
permits him absolutely to disinherit such child, though the child
be not provided for by settlement. . . .

"If the testator is, under the act, at liberty, as he undoubt-
edly is, to disinherit his children born after making his will, he
is, of course, at liberty to make an unequal division of his
property by will between his children born before making his
will and those born afterwards."

The case of *Estate of Callaghan*, 119 Cal. 541, 51 Pac. 860,
39 L. R. A. 689, is a remarkable one. The Civil Code in that
State provides (section 1307): "When any testator omits to
provide in his will for any of his children, or for the issue of
any deceased child, unless it appears that such omission was in-
tentional, such child, or the issue of such child, must have the
same share in the estate of the testator as if he had died in-
testate, and succeeds thereto as provided in the preceding sec-
tion."

After disposing of the great bulk of her estate, the testatrix says: "I own six acres of land, more or less, in Alameda, Alameda county, California. Said land I give, devise and bequeath to Bertha and Josephine, the two children of Sherwood Callaghan, to be held and enjoyed by them during their lives, and the life of the survivor of them, and in case of their death, leaving issue, then to such issue, share and share alike, according to representation. But, in case the said Bertha and Josephine die without issue, then said property shall revert to my son, Daniel Callaghan, and my daughter, Mary Bailey, share and share alike." No other mention was made of the grandchildren, Bertha and Josephine. Upon the trial, evidence was offered to show that the testatrix did not own any land in Alameda county at the time the will was made, or thereafter up to the time of her death, and that the estate did not own or claim to own any land in said county; that the testatrix once owned twenty-five acres in Alameda county, but had sold and conveyed the same to one Hawley before the making· of the will, and had never owned or claimed to own any land in said county other than that sold to Hawley; and that said grandchildren had never received any portion of the estate of the testatrix in her lifetime by way of advancement. This evidence was objected to and excluded, and the case was taken to the · Supreme Court, which said:

"The words, 'omit to provide,' as used in said section, mean simply an omission to make provision in the will, and has no reference to the pecuniary value of such provision. It is apparent that the Code provision in question expresses no intent to in any way limit the disposing power of the testator, or compel him to provide for any child, for it clearly provides how the testator may decline to give anything to any such relative. This being so, what is the object of the provision? Nearly all of the States have provisions substantially the same as that · here under consideration, and, as such a provision is not in-

tended as a limitation of the power of a person to dispose of his property by will, it has been uniformly held that the provision applies only to a case where a child or descendant is unknown or forgotten, or for some reason unintentionally overlooked. 'The object of this statute was to guard the testator against the effect of a mistake in providing for some of his children, to the exclusion of others, through forgetfulness of their existence, or in otherwise disposing of his property in such forgetfulness, and the failure to allude to them is made evidence that they were forgotten.'

"In the case of *Payne*, 18 Cal. 291, the exact provision as it now stands in the Code was under review, and Field, C. J., speaking for the court, said: 'The children are mentioned three times in a codicil, showing that they were in the mind of the testator at the time, and not overlooked in the disposition of his property. And the only object of the statute is to protect the children against omission or oversight, which not unfrequently arises from sickness, old age, or other infirmity, or peculiar circumstances under which the will was executed. When, however, the children are present in the mind of the testator, and the fact that they were by him is conclusive evidence of this, the statute affords no protection if provision is not made for them.' "

In that case a bequest of property which existed merely in the imagination of the testatrix was sufficient to show that the grandchildren, who were the nominal beneficiaries of this unreal bounty, were not forgotten, but were in the mind of the testatrix, and therefore not "only pretermitted."

The Wisconsin statute reads as follows: "When any child shall be born after the making of the parent's will, and no provision shall be made therein for him, such child shall have the same share in the estate of the testator as if he had died intestate; and the share of such child shall be assigned to him as provided by law in case of intestate estates, unless it shall be

apparent from the will that it was the intention of the testator that no provision shall be made for such child." Rev. St. 1898, sec. 2286.

The will under consideration in the case of *Verrinder* v. *Winter*, 98 Wis. 287, 73 N. W. 1007, contained this provision: "I hereby bequeath to my wife, Margaret Winter, two-thirds of my estate while she remains my widow, if not, one-half to go to her heir, and the other third to go to my brother, David Winter."

The will was made *in extremis*. The testator left no child then born to him, but left his wife pregnant—of which fact he was aware. The court held that the words "her heir" referred to "her unborn child" with absolute certainty; that the remainder to "her heir" was contingent, depending upon the widow's possible marriage. After stating that the authorities were somewhat at variance as to whether a "contingent remainder" was a provision, the court declares:

"But we do not find it necessary to decide the point in this case, because, as we view the case, the result in either event is the same.

"It is clear that the testator referred to the child in his will, and gave it a contingent remainder in one-third of his estate. It also seems clear that he intended to give the child just what the terms of the will give it. Now, if such a contingent remainder be a 'provision' for the child, within the meaning of the statute, then the first contingency above named has happened, and the will must prevail; and if, on the other hand, such a remainder is not a 'provision,' then the will shows the intention of the testator not to make a 'provision' for the child, within the meaning of the statute, and the will must likewise prevail. The word 'provision' must have the same construction when used in the two parts of the same section, and, giving it that construction, we see no logical escape from the conclusion above stated."

In *re Donjes' Estate*, 103 Wis. 497, 79 N. W. 786, 74 Am.
St. Rep. 885, the court says: "Considering our own statute
untrammeled by the varying decisions of other courts, it must
be born in mind that the legislative purpose was not to restrict
the parent, nor to dictate to him what provision he should make.
It is not to control his intention, but to provide for after-born
children in the not improbable event of forgetfulness or over-
sight of the parent, upon the very presumption, indeed, that
if he thought of them he would have intended that they should
have some share in his estate, and that share the law would then
fix. The power of the testator to decide whether anything,
and, if so, how much, and in what form, should be given to·
after-born children, is as uncontrolled as if there was no statute
on the subject. And if it be apparent that he was not forget-
ful, that he had the after-born child in mind, and satisfied the
statute by making for it some provision, we do not conceive it
the purpose of the statute nor the province of the court to
say that such will shall not govern, but that he not only must
make some provision, as the statute requires, but must make
provision adequate, in the opinion of the court, or provision in
any particular form. Such holding seems to us to import into
the statute words and a purpose not necessarily there, and
would infringe upon the freedom of will in disposing of prop- .
erty and regulating estates. It is not apparent why it should not
be as much in the power of the testator to place a child, born
after the making of his will, in a state of dependency on the
mother, as it confessedly is to do so with the child in existence at
the time the will was made. The perils to the child in each case
are the same, and the reasons justifying, or failing to justify,
interference by the Legislature with the parent's wishes on the
subject, do not vary in one case from the other. Independently
of our view as to the sufficiency of this devise, still, we having
decided that a devise is made, the same conclusion must be
reached upon the same reasoning applied in *Verrinder* v. *Win-*

*ter,* namely, that it appears from the will that such, and no other, donation was intended, and, if that is not a provision, none was intended."

The authorities are certainly not harmonious upon this subject. We might have placed the opposite construction upon our statute and found decisions to support such a conclusion. Without the aid of any authority, but relying only upon established rules of construction to ascertain the meaning of our statute, we would be constrained to hold that any provision which afforded evidence that the child had not been forgotten was sufficient to prevent the application of the statute; that the statute did not intend to produce equality, or to diminish the power of the testator, but merely to regulate its exercise; and that a vested remainder carrying with it a vested right of property, though postponing its actual enjoyment, answered the demands of the statute.

We are of opinion that James W. Allison, Jr., was not pretermitted by his father's will.

Upon the whole case we are of opinion that the decree of the Chancery Court of the city of Richmond is erroneous in holding that the ultimate remainder to the heirs of the testator vested at his death, and that in this respect the decree appealed from should be amended, and, as amended, affirmed.

We are also of opinion, in view of the novelty and difficulty of the questions presented for decision in this record, and that it would have been eventually necessary for the executors to ask the aid of the courts in construing the will of their testator, that the costs should be paid out of the estate in their hands to be administered.

CARDWELL, J., dissenting:

I dissent from so much of the opinion of the court in this case as holds that Mrs. Moore and James W. Allison, Jr., who take the ultimate remainder in the residuum of their father's

estate, take a contingent and not a vested interest therein, and will briefly state my views, and cite the authorities upon which I mainly rely.

As an original proposition, I would never give my assent to the application of a rule of construction to the will in this case which requires that the words "my heirs at law according to the laws of the State of Virginia," as used by the testator, James W. Allison, deceased, in disposing of the ultimate remainder in the residuum of his estate, to be taken as referring to his heirs, etc., to be ascertained as of the period of his own death, and not at the death of his daughter, Mrs. Moore, who is to enjoy the whole of this residuum during her life. The application of this purely technical rule of construction has doubtless worked a hardship in many cases, overturning the apparent intent of the testator, and I have the gravest apprehensions that this is the result in this instance; but the opinion of the court seems clearly to demonstrate that the doctrine of *stare decisis* fixes the rule upon us, and that under it the conclusion reached is inevitable as to who is to take the ultimate remainder in the residuum of the testator's estate upon the death of his daughter, Mrs. Moore, without issue who attain the age of 21 years.

Having reached the conclusion that the heirs of the testator who were to take the ultimate remainder are to be determined as of the death of the testator, the learned judge below, in my opinion, was plainly right in holding that those heirs, Mrs. Moore and James W. Allison, Jr., each take a vested remainder in fee in an undivided one-half of the residuum of their father's estate, subject to be divested only upon the happening of the events referred to in the intervening limitation to the children of Mrs. Moore, viz., the dying of Mrs. Moore leaving issue surviving her who attain the age of 21 years.

There has been no moment of time since the death of the testator when the heirs in whom the ultimate remainders vest

were not in being and ascertained, and therefore every requisite of a vested remainder is found to exist.

A remainder is none the less vested because it is liable to be divested. *Lantz* v. *Massie's Ex'x,* 99 Va. 709, 40 S. E. 50, and authorities there cited. I refer also to the authorities cited in that part of the opinion of the court which deals with the bequest to trustees for the benefit of Mrs. Allison for life, with remainder to her son, James W. Allison, Jr., relying especially on *Howbert* v. *Cawthorn,* 100 Va. 649, 42 S. E. 683; *Moore* v. *Lyons,* 25 Wend. 119.

*Amended and Affirmed.*